May it please your court. My name is Jake Basilinsk on behalf of lead plaintiffs Walleye and the securities class action alleging insider trading. I want to start by just telling the very basic story at issue in this case. IntelSat was engaged in a bet the company deal to get permission from the FCC to launch a private auction of C-band spectrum. If the deal went forward, everyone agrees IntelSat's valuation would skyrocket. If the deal did not go forward, IntelSat was headed to bankruptcy. IntelSat thought the deal was going to go forward. Its CEO thought he had a handshake deal with Chairman Pai, the key decision maker. Analysts also thought the deal was on track. However, rumors began to surface that Senator Kennedy was rallying political support against the deal. And so on the evening of November 4th, IntelSat's lobbying group, the C-band alliance, reached out to the FCC and asked for a meeting the next day, apologizing for the short notice, trying to get a handle on the situation. That meeting happened, and according to confidential witness testimony, bankruptcy testimony, board minutes, and other corroborating sources, the meeting went terribly. At the meeting, the- Well, wait, wait, stop, because we've all read the record, and maybe you can cut your description shorter. According to the bankruptcy testimony, at least the actual testimony given by human beings, it says what happened at the meeting was inconsequential. No one was told what the people at the meeting were told was we haven't decided yet, and they weren't given much more information than they had before. You have confidential informants who weren't at the meeting who say, well, that may be true, but the body language of the person from the FCC they were meeting with must have communicated this to somebody else. But the record does not indicate that the meeting went terribly. So I don't think that the bankruptcy testimony says nothing was communicated. Well, it says that they were told no decision was made yet. They were, and perhaps you're thinking of Chairman Pai's testimony, not in the bankruptcy, but in a Senate hearing. Right. He says, he says I talked to my counsel, and he says he didn't tell him anything. So I just want to distinguish. There's, in the record here, there's testimony from the bankruptcy proceeding that is different than what Chairman Pai said, where there's discussion. Is there any testimony from the, and you agree that the testimony from the bankruptcy proceeding is relevant? Absolutely. Tell me what testimony there is from the bankruptcy proceeding that the people who attended this meeting were told that a public auction was going to be conducted. They were, there's no record that says they were told absolutely that was. Okay, so tell me what testimony there, just tell me what testimony there is in the record that says they were, that somebody told them it was probable or likely. The, the, the context is that going into the meeting, prior to the meeting, they thought they had a handshake deal. And there is clear testimony that coming out of the deal, they all felt that something had changed, that the situation had taken a turn for the worse. The confidential witnesses, and I know that's not what you're asking, say, including CWs who were, who were informed of what happened at the meeting right afterwards, that it was a 180-degree reversal. Now, but, but, but again, we all read this record, and what I got from it is that all of this is based upon the body language of the lawyer for the chairman. If you were writing a public disclosure of what happened, what would you have said? Were you relying on the body language of the lawyer who said nothing to confirm the idea this wasn't going through? So how would you write that? I would say, so who am I when I'm writing this? Am I? You're just saying, based on the body language of the counsel, we've concluded this is not going forward. You wouldn't have written that, would you? I, I would not have said due to the body language. It would be silly. What I would have said is the company had an understanding that there was. Based on what? Prior communications, the company believed things were going well. That was their That's correct. They had been, they'd been approaching them and asking them to conduct a private auction, and they thought their, their entreties were falling on receptive ears. And they went to this meeting, and now they were said, no, maybe I'm not so sure about this. Indeed, there had been 50 meetings with the FCC on this very point before. What changed? Well, what changed was that Senator Kennedy had rallied political support against the deal. Public information. And we have an email from Degani, the actual participant for Chairman Pai, saying, given where we are, we should play things cold, correct? And That isn't the information that's at issue, right? So we've got to figure out what's material, what's non-public, and what's the information. So I'm back to what is the information, and how is that distinct, to make it non-public, from the public record that, you know, Senator Kennedy and others had already established? So, so one way of thinking about this is the information was what the FCC had conveyed. And I think my view of the record is there's reason to believe they conveyed something of substance, right? Another way of looking at it. But under the pleading standards, don't you have to say a little bit more than something of substance? Yeah, it's what they conveyed was that there was a change in the FCC's willingness to go along. Well, but you haven't alleged that anybody at the meeting said, gee, we were willing to go along with this in the past, but now we're not. So what you've conveyed is that people left the meeting with an impression that things might not be as favorable as when they went in. Is that the non-public information that you're, that you think should have been disclosed? So I want to explain sort of two, two thoughts here, right? No, but first answer my question. We, we believe there are two ways of looking at what the non-public information was, and both of them would be actionable. One of them, which is the question you just asked, is absolutely an allegation in our complaint, and I believe a perfectly substantial one. Which is basically, based upon the body language of the chairman's lawyer, you holistically believe this is what came out of it. That's not, doesn't qualify under 9b, does it? I, I absolutely, so I just, there's two things at issue. I think that if the question were just, is it MMPI, is it non-public information that the FCC had changed body language in a substantial way, given the importance of this deal? You're going to rely on body language for material part? How about you give us what else you're relying on? And the other way of looking at it is that the company's own view of the prospect of the deal is itself MMPI, and we cite a number of cases that show that, for example, a company's view of the likelihood of FDA approval of their drug is absolutely MMPI. A company's view of its own likely forecast is absolutely MMPI. Okay, so thank you. That, that's, that's helpful in terms of moving this down. I guess I want to explore a little bit now the other element of this. Where's the who, what, when, where, how of this communication to defendants? Yep, so there's no question at all that we do not, at this stage in the case, in the record, have the smoking gun evidence of exactly when they were. Well, you don't have, not only not have the smoking gun evidence, isn't it fair to say you have no evidence? We, what we have is very strong circumstantial evidence. You have, you ask us to infer that because a sale was made in close proximity to the meeting, that that's enough to demonstrate that the information was given from the people in the meeting to other people. Our argument is very much an inference, and it is not just the timing of the trade as an inference. It is the entirety of the circumstances. It's the importance of this deal to the company. It's the fact that there was a sense that there was a 180 degree reversal. It's the fact that the time, the trade occurred that same day. It's that a very large quantity of shares were sold in an urgent aftermarket block trade at a discount. I guess, at least my review, correct me if I'm wrong, is that, you know, the PSLRA pleading standards require a little bit more than, I think what you have here is motive and opportunity, perhaps, right, at best. Who did that? I mean, who communicated what? Which then takes us back to what the information is. But, but I don't think that this is purely a motive and opportunity. I think it is a totality of the circumstances. And what TELEBS instructs is that even in PSLRA 9b standard cases, you are to look at the totality of the facts and make the decision of whether or not there is a strong inference supporting the claim. Is there, with respect to the circumstantial evidence, a big piece of this is the block sale. Anything in your complaint that suggests that this block sale was inconsistent? Because I think there's a plausible inference on the other side that there is an earnings report and this was within the window. So do you have anything that suggests that this is a departure from what they would have done or had done in the past? Yeah. So defendants make the argument that they had in the past also sold shares and there is no record that they had ever engaged in this sort of urgent, steep discount to the market price block trade as a way of disposing shares before. Well, that's not their burden to come back with respect to the complaint. Don't you have to allege, and I don't know whether it's information available publicly or not, but that it's not for them to come back. You have to, don't you have to say to carry your pleading burden that you've looked at the past block sales or other trades or whatever and they've never done that before? I have no, I don't know. Yeah, they have made sales in the past. There's no reason to believe they've ever made a block sale like this to dispose of shares in the past. But with respect, counsel, it seems to me you've got this backwards. In order to satisfy 9b, don't you have to show who it is that had the information, to whom that was communicated, and that that was used as the basis for these sales? To start with, who is a big question? Almost every person you've interviewed, it's all an inference, just assuming this occurred. It's all holistic. Why is that enough under the case law? Telabs does not say that particularized pleading requires pleading every single detail of the allegations. This is all just speculative, is it not? The core premise of Telabs is that you look at the facts as a whole and you assess whether or not the inference is as plausible as any alternative inference. The alternative inference— No, it has to be more plausible than an alternative. My understanding of the standard is it's at least as— I think a tie goes to— Well, okay, let's assume a tie goes to the runner. And so our point here is the alternative inference here is this was a huge coincidence. And that's possible. Discovery might prove that to be the case. We're not denying that. But the inference that on the day the company learned that there was some change that put at jeopardy their bet-the-company deal, that a couple weeks later actually emerged as causing the company to completely fall apart. Their two biggest shareholders and their board chairman sell 246 million shares of stock in an urgently marketed, steeply discounted block trade. We think— And held on to, in the case of one of the shareholders, 86 percent of its stock. And I don't think the fact that they held on to a position is in any sense counter-evidence of the fact that this was motivated. Why not? If you hold a vast majority and you don't sell it, doesn't that tell you something? Yeah. So there's a number of cases that have recognized percents like this are suspicious. But more importantly, the logic of it, the logic of the alternative inference is, look, if we really had MMPI, we would have sold all of it, or we would have sold a whole lot more of it. Well, isn't there one defendant— I was trying to find this in the record so you can help me on this. Wasn't one of the defendants under a restriction about not selling stock until this point? Wasn't there a six-month stay on one of them? I don't believe so. I thought the district court made some reference to that, but maybe your friends can talk about that. You want to save any of your time? You're down to two minutes. Sure, I'll preserve the remaining. It's up to you, okay? All right. Now, we've got, I guess, three different lawyers here, right? And who's going first? May it please the Court, Melanie Blunschi for the B.C. Partners Appellees. Okay, very well. Separate counsel. And you each have five minutes, right? Thank you, Your Honor. Very well. Okay, please proceed. Yes. In this case, plaintiffs have not come close to meeting the PSLRA requirements for pleading material non-public information or scienter, and on top of that, have not met the requirements for statutory standing because they do not even allege that they traded in the block trade. With respect to MND... Do we have to reach statutory standing? You do not have to reach statutory standing. If we agree with you on the rest. If you agree with us... Because there seems to be some contrary case law on that issue. Do you agree? There's not binding contrary case law. I understand. If there were binding contrary case law, neither side would be making the argument. Correct. Under the two binding precedents, Brody and Neubrauner, the court must screen out plaintiffs who could not possibly have traded with defendants. And Walleye does not allege that. This is on the contemporaneous issue, right? Exactly. And what's your best argument that this was not contemporaneous trading? Sure. Under Brody, contemporaneous in the Ninth Circuit has been interpreted to mean someone who could possibly have traded with the defendants. But didn't Congress, following I think Shapiro, the Second Circuit case, basically... It's kind of a proxy concept of not whether you actually traded with them, but whether you could have traded with them. Isn't that the standard that we would be looking at, perhaps? Whether you could have is also exactly what Brody and Neubrauner... That's what Shapiro said, right? Shapiro does... But subsequent to Shapiro, Wilson, which was also incorporated in that House report... I can say that the House specifically referred to the Shapiro case, right? The House specifically referred to Shapiro and Wilson, the subsequent case, which made clear that contemporaneous should be interpreted to mean counterparties that could have traded. And in this case, that could have... Putting aside the issues that we've raised about whether the 9b pleading has been satisfied, if it had been satisfied, if we followed the Shapiro line of reasoning and Wilson, wouldn't this be enough for them to have standing? No. So, including because Brody and Neubrauner require plaintiffs to plead with particularity their contemporaneous... That's the 9b issue, right? Well, it's applying 9b to the contemporaneous... Well, but here's my problem with your argument, taking the could have traded too far. And again, it may not be necessary in this case. Let's assume the sale is made on day one. You agree that people who buy roughly contemporaneously, which is maybe day two or three, still are entitled to sue? Not in the case where we're dealing with a private law firm. Well, I understand, but let me just... But we are certain, even if you sell on the public market on day one, that people who bought on day two or three could not have bought your shares, correct? Just by timing. It may be contemporaneous, but we know the sale occurred on day one and the next couple of people bought on day two or three. So, those folks, all the case law says have standing to sue. So, it seems to me it can't just be enough that they couldn't have possibly bought from you. There must be something else in the statute. Now, in your case, we know they couldn't possibly have bought because it was a private sale and we know who the buyers were. But the same thing is true if we have roughly contemporaneous transactions that occur two or three days later. You got your money out of the sale on day one and the roughly contemporaneous transactions occur on day two and three. We know that the people on day two or three didn't buy from you, but nonetheless, we give them standing. So, tell me how you can reconcile the two of those. Sure. So, for one, it's generally considered a very tight window. No matter how tight it is, under my example, you know the people who bought on day two or three didn't buy from the seller who sold on day one. So, although potentially in the open market, you might have a better argument that their shares were affected directly by the buying and selling, whereas in the private trade, you definitely don't. But of course, we don't need to get to that, especially, you know, when we look at, it's not even particularly pledged as MNPI. If we look at... Ms. Lucci, I'd like to ask you that. Welcome back, by the way. Hope you've had a good week. Thank you. Good to see you again. What, I guess, a concern here that your friend has raised is what more would they have to show given all these coincidences lining up? I mean, they don't know. The block sale isn't public in terms of the details of it. Of course, the whole meeting is private. What's missing from their allegations and how would a plaintiff be able to develop those allegations with particularity under the standard you urge? May I finish my time as... Yeah, you can answer his question, sure. Thank you, Your Honor. There is no trap door. Thank you. Well, with respect to, first of all, the failings on MNPI, if we look to Epstein versus Washington State Energy, the circuit has held that reliance on predictive statements in the context of regulatory proceedings is inherently unreasonable. So the regulatory process does not ordinarily invoke a duty to disclose. So when all we're talking about is more likely, less likely body language, there's just no way for plaintiffs to cross the line on MNPI. And then with respect to Scienter, under Tell Labs, we do have to have the competing inferences of the hearsay confidential witness testimony... And you're getting out farther from what his question was. Versus the sworn testimony in the bankruptcy proceeding from both Mr. Coller and Mr. Spengler, ER-91, BCSER-74. So they would have to close the gap and have sort of more specific communications or pleading allegations about communications or at least an avenue of communications. You know, in America West, for example, they plead board meetings and attendance at board meetings. Here, they plead that these defendants were typically updated at board meetings, but they do not plead that there was any board meeting. They do not plead it could have happened in those scant hours. Let me ask my colleagues if you have additional questions. I know you'd have lots more to say, but you've got... One of the difficulties with splitting arguments three ways, I will tell people, is that nobody gets to make a complete argument. That's a good way. It's your choice and you're all experienced lawyers. Good way to put it. All right. And who are you representing? I represent Defendant Appelli, David McLean. Okay, please proceed. Good morning, may it please the court. So there's a variety of avenues we've set forth in our briefing that would allow this court to properly affirm. I want to focus on two. They are the basis for the district court's dismissal. The first is the lack of any particularized factual allegations to show Mr. McLean's possession, non-public information at any point in time. Can I stop you there? Yeah, of course. Because it's the question that I want to ask somebody on your side,  When I look at this conglomeration of facts, if you asked me whether I thought these people likely learned something or something that happened that day likely triggered a private sale in the nighttime, it does seem likely to me. Now, maybe the PLSRA and Rule 9b don't allow me to get there. But aren't we allowed to look at this through the lens of a little common sense? It wasn't the day before. It wasn't three days later. It was right after they had this meeting. Nobody's claiming on your side, gee, we learned something completely different, or we needed the money or something. So it may not be able to get us there in a securities case, but there is some purchase in my mind to the plaintiff's notion that, oh my God, of course, you know, common sense suggests you learned something. I certainly know that. Respond to that. Yeah, of course. Maybe common sense is not enough in securities cases. Well, I would certainly agree with that. Well, stipulate to that. And so I'm going to attempt to not totally rely on the pleading standard in answering your question. On its surface, yes, I understand first blush, there might be a sort of, oh my goodness, this must have been something. Gosh, I think Senator Kennedy had the same reaction. But what this requires, even from a common sense perspective, is that outside directors of the corporation were informed about one meeting, one of 50, on a near instantaneous basis, and then completed a block sale later the same day, just after market flush. What if they allege that Mr. McGlade was present there that night? So there's allegations that he would office there sometimes. What if he was there? The office allegations are interesting. Well, I'm adding an allegation that I'm just trying to figure out how much smoke leads to fire under these pleading standards. Yeah, I'd like to answer that just directly, which is I think the starting point for a conversation of a viable complaint is some particularized fact to show a communication between someone in the know and Mr. McGlade. That we don't have. And that can't just be, as we talked about, motive and opportunity that assume they allege that he was in the office that day, that night. There's already allegations that he regularly communicated with them. Does there have to be an allegation, an additional allegation, and he was either at the meeting or he was told that day? Do they have to say who, what more? Well, I think under New Bronner, yes, absolutely. They have to say who told him what and when. That's clear Ninth Circuit law, rule 9b. If, so I, I'm one, do you have more question than that? He's basically asking if we didn't have rule 9b, would this be a viable case? Frankly, I think it fails under Twombly-Iqbal as well, because it lacks any facts whatsoever. But certainly under 9b and the PSLRA, we're not even close. They have to say who, when, where, all those questions, right? To be, have it be viable? Uh, yeah, they have to meet the New Bronner standard. And there's no allegation that anybody in the know told Mr. McGlade about the suspicion, the holistic concern, right? There is no allegation that anyone spoke to Mr. McGlade on November 5th about anything whatsoever. And that's essential under 9b from your perspective? Yes, sir. No circumstantial, uh, securities fraud cases under PSLRA. Oh, no, that's not what I'm saying. I think that the, the fact of a communication with Mr. McGlade would potentially provide some circumstantial evidence that with other things may well lead to a potentially viable case. So if, if, if one of the confidential witnesses said that they saw him talking to someone, but they didn't know what they were talking about, that's the sort of thing you're, you're saying, but even that's missing. Yeah, so something like, we saw Mr. McGlade approach the folks at the hotel after the meeting. That would be a much more viable case than the one we're looking at. Yes. Um, and I just wanted to point out at the end, there's no cogent and compelling inference of scienter whatsoever here. Mr. McGlade lost $81 million in the offing, leaving most of his shares on the table, uh, through the block trade. So, uh, in the absence of any facts, there's obviously no, uh, cogent or compelling inference of scienter. And what, what, what, uh, amount of, what percentage of the shares of the company did he retain after the sale? Oh, percentage of shares of the company? If you know. That I couldn't tell you, but he retained approximately 86% of his total holdings. Okay. So if, if he thought there was something wrong, again, your friend on the other side sort of talked about that, uh, it can bear on it, but it's not, not determinative, right? Uh, that's correct. And there was nothing that would restrain Mr. McGlade from selling on the open market if he thought that IntelSat was doomed to bankruptcy. Okay. Any other questions about my colleague? Thank you. Okay. And you are representing? Yes, uh, Gerson Zweifack for the Silver Lake Defendants. Okay. I'm not here to argue for a great coincidence. I think if the court conducts the review commanded by Tell Labs, a holistic review of everything, including the material subject to judicial notice, like public trading records, you will come up with a compelling inference that Silver Lake's trade had nothing to do with the meeting on that day. Um, why do I say that? Well, uh, Silver Lake was off the board for three years before the trade. The only argument that they make, um, about Silver Lake having, potentially having access to the information is they cite the shareholder agreement. The shareholder agreement, which they cite five times, was subject to judicial notice. That's why we have the doctrine. And what it says is not you get board materials. What it says is you get what you need for your own internal and regulatory purposes. Did the named three defendants in this case engage in a joint sale of their stock? Yes. And let me say, um. In other words, it's hard for me to separate if one of them had, if there was a sufficient Right. As to one. Right. It would seem to me to be much easier to say it was sufficient as to all because they all sold together in the same transaction, no? Not for the Silver Lake defendants. Because during the. I understand. But is it not true that they sold together in the same transaction? That's absolutely true. With the other two. So let me. Because. No, stop fighting me for a second. Let's assume for a moment that there was dead certain evidence that one of the other defendants had inside information. Is the fact that you all sold together in the same block transaction, wouldn't that give me sufficient evidence, at least at this stage of the pleading at this stage, to keep in Silver Lake? No. Because the evidence is that Silver Lake, during the sort of golden age of this handshake agreement, where everybody was anticipating a 770 percent return, Silver Lake was selling. Silver Lake sold 4.3 million shares during the time of the pendency. Well, that might go to Scienter, Mr. Svitoff. But I guess to kind of follow up on this question, I guess it's kind of a mechanical question because I'm not sure how much of this is alleged or just inferred by it. How would Silver Lake for the trade get notice of its tagalong rights? You have a sale. Does the idea of a block sale pursuant to the tagalong rights require communication? Absolutely. It's right there in the shareholder agreement, which was incorporated by reference. And what it says is BC partners cannot sell a share without inviting Silver Lake to participate. So they had to invite us to participate, which is what happened. So what you're saying is that even if BC partners had inside information, we can't attribute that to Silver Lake because you were required to sell if BC partners did? They were required to invite. And they'd have no reason to tell us anything because that would be inducing us to do that which they knew we would do anyway. We had been selling for a year. We sold over 2 million shares the quarter before. From the plaintiff's perspective, assuming we've had a set of questions about the gap between the corporate insiders and the defendants here, but among the defendants, that would be an opportunity at least of communication that happened that day among the defendants. It was a requirement that they communicate and invite to the trade. But there'd be no reason for them to tell us that which they knew we would do anyway because it was quite public for a year with public filings that Silver Lake was exiting the stock. So if they suddenly decided after months of watching us sell in the face of this handshake agreement and not cluing us in, we're going to reverse course. We're, for old times' sake, we're going to tell them about this. They'd have no reason to do it. That's scienter, but in terms of the passage of the material nonpublic information, that would be an opportunity. That'd be an opportunity. They'd have no reason to do it. And we didn't need the opportunity. We didn't need a motivation. We had been doing it for a year. If I can just address the 14 percent for a second. Very quickly, yeah. I'm sorry. Court pointed out that 14 percent is a small number. Everyone sold only 14 percent of their holdings because everyone had to sell an equal percentage of their holdings pursuant to the tagalong rights. And you're right. In this case, think about this case. The theory of materiality is either it's billions or it's immediate bankruptcy. So who in their right mind would think, here's an idea. I'm about to be wiped out on my investment. I'm only going to sell 14 percent. That way I'll have a good cover story when the 86 percent gets wiped out to zero. Thank you. Thank you very much. All right. So you have rebuttal time. Thank you. There's three things I'd like to address, and one is by far the most important. I'm deeply worried about the idea that we shouldn't decide this based on common sense. The standard set by TELEBS is very— Or maybe we should decide it according to the law. And what the law says in TELEBS is that the requirement is particularized splitting, which I'll address in a second, and a strong inference, which is, is it as likely as the alternative? The particularized pleading requirement does not set magic rules about you must show the who, what, where, when. And I really implore you to read New Brunner. It doesn't say that's a requirement in every case. But with respect, I've never seen a case like this where basically the body language of a monosyllabic lawyer is the basis of your case. It's not— This opens everything up. It makes it so that people say, well, you know, I was along the street, and I saw somebody doing some drugs, and they did it a particular way that I thought I should sell my stock. And that makes no sense to me. So that's a question about the materiality of the information, which is slightly different from what I'm trying to talk about right this second, which is, what is the pleading standard for whether or not the inference of Sanger has been met? And the standard there is, are the facts pled— And together, do those facts together support a strong inference of Sanger? There's no magic rules requirement. New Brunner doesn't state one. Well, but the question is not an inference of Sanger, at least for me. The question is whether those facts pled together create a strong inference that inside information— Assuming— By the way, nobody's addressed this, so we shouldn't spend time on it. You're all assuming that the body language of the person in the meeting was inside information. He's a public official, and I think people might be able to see his body language in any event, but let's assume that was. Put aside Sienta for a moment. What's the evidence that that inside information was transmitted to these defendants? It is exactly the question of, is this just a big coincidence, or is the inference reasonable that that's why they traded? And I have very little time left, so I just want to address one thing on the standing point. The cases that they cite do not say that you need to have potentially been the counterparty to the trade. They are trying to grapple with the question of what period of time is appropriate for contemporaneous trading, and in doing that, some cases talk about, well, were you likely trading in the same market as them, with them in the same time period? There has never been understanding that the standing requirement refers to actually having been the potential counterparty. The entire point of passing 20A was to get away from a privity requirement, and the logic of injury for an insider trading claim is that you were deprived of information that you had a right to receive as a member of the public because the defendant violated the duty to abstain from trading or publicly disclose the MMPI that they had. And that's all the time that I have. Very well. Thanks to all counsel. Very helpful to the court. The case just argued is submitted.
judges: SMITH, HURWITZ, JOHNSTONE